**SO ORDERED.**

**SIGNED this 25 day of September, 2015.**

_____
**David M. Warren
United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF NORTH CAROLINA
# WILMINGTON DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 14-05896-5-DMW |
| SURFACEMAX, INC. | CHAPTER 7 |
| Debtor | |

| | |
|---|---|
| SURFACEMAX, INC. | |
| Plaintiff | ADVERSARY PROCEEDING |
| vs. | NO. 14-00049-5-DMW |
| PRECISION 2000, INC. and INTERNATIONAL FIDELITY INSURANCE CORPORATION | |
| Defendants | |

## MEMORANDUM OPINION AND ORDER
## DENYING MOTION TO DISMISS AND ALLOWING ARBITRATION

This matter comes on to be heard upon the Defendant's Motion to Dismiss, or in the Alternative, to Stay Based on Arbitration Agreement ("Motion") filed by Precision 2000, Inc.

("Precision") on November 11, 2014, the response in support of the Motion filed by International Fidelity Insurance Corporation ("Fidelity") and the response in opposition to the Motion filed by Algernon L. Butler, III, Esq. ("Trustee"), the Chapter 7 trustee for SurfaceMax, Inc. ("Debtor").[1] The court conducted a hearing in Raleigh, North Carolina on July 27, 2015. William P. Janvier, Esq. appeared for Precision and Fidelity, and Hunter E. Fritz, Esq. appeared on behalf of the Trustee. At the conclusion of the hearing, the court took the matter under advisement. Based upon the evidence presented and the arguments of counsel, the court makes the following findings of fact and conclusions of law:

A.     BACKGROUND.

1.     The Debtor filed a petition for relief under Chapter 11 of the United States Bankruptcy Code on October 9, 2014 ("Petition Date"), initiating Case Number 14-05896-5-DMW ("Bankruptcy Case"). The Bankruptcy Case was converted to a Chapter 7 case on January 15, 2015, and the court appointed the Trustee to fulfill the duties as provided in 11 U.S.C. § 704.

2.     The Debtor is a construction contractor in the business of grading and asphalt and concrete paving, among other work. Prior to the Petition Date, the Debtor was a sub-contractor for Precision pursuant to a Subcontract Agreement ("Agreement") executed March 6, 2014. The Agreement pertained to work on a construction project ("Project") for the United States Army Corps of Engineers ("Army Corps") at Military Ocean Terminal Sunny Point near Southport, North Carolina. Precision is the general contractor on the Project, and Fidelity is Precision's surety on the Project pursuant to a payment bond ("Payment Bond") executed October 4, 2013.

---

[1] On December 2, 2014, the Debtor filed a response in opposition to the Motion. The Debtor's case was subsequently converted to a Chapter 7 case, and the Trustee was appointed prior to any hearing being held on the Motion. The Trustee filed a Notice of Appearance in this Adversary Proceeding on February 3, 2015 as attorney for the Chapter 7 Trustee, but the Trustee not filed a motion to substitute himself as a party in interest. If filed, that motion would be allowed. No party has objected pursuant Fed. R. Civ. P. 17 to the Trustee's failure to substitute himself as a party in interest. The Trustee filed his response to the Motion on June 29, 2015, essentially supplanting the Debtor's response. The court did not consider the Debtor's response at the hearing on the Motion.

2

3. Precision asserts the Debtor failed to perform under the Agreement, and Precision terminated the Agreement on July 25, 2014. Precision claims the Debtor owes over $695,000.00 in damages to Precision for money Precision was forced to expend to secure a replacement subcontractor.

4. The Debtor, on the other hand, alleges that Precision refused to pay the Debtor in accordance with the terms of the Agreement, and the Debtor was essentially forced to cease construction services under the Agreement before Precision terminated the Agreement.

5. Section 26 of the Agreement governs disputes between the parties. Regardless of whether the dispute involves "the correlative rights and duties" of Army Corps, "at [Precision's] sole option, [any] disputes [between the Debtor and Precision] may be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then obtaining." The Agreement states that arbitration shall take place in Atlanta, Georgia.

6. Precision demanded arbitration to settle the dispute between the Debtor and Precision. Precision's demand for arbitration was pending as of the Petition Date. On its Statement of Financial Affairs, the Debtor listed "Precision 2000 v. Surfacemax, Inc." as a demand for arbitration "to which the debtor is or was a party within one year immediately preceding the filing of this bankruptcy case."

7. On October 30, 2014, the Debtor filed a Complaint ("Complaint") against Precision and Fidelity, asserting the following claims:

    a. Breach of contract;

    b. In the alternative to a breach of contract claim, payment under the theories of unjust enrichment and *quantum meruit*;

      c.      Conversion;

      d.      Unfair and deceptive trade practices;

      e.      Turnover of property;[2] and

      f.      Payment by Fidelity under the Payment Bond.

      8.      The Debtor asserts Precision owes the Debtor the amount of $610,601.09 for work performed under the Agreement, as well as for reimbursement of materials that were furnished by the Debtor in order to perform the work required by the Agreement. Specifically, the Debtor asserts a claim of $541,659.12 for work performed under the Agreement through June, 2014 and materials purchased for the Project ($12,062.37). The Trustee estimates the Debtor is owed "at least several hundred thousand dollars" by Precision.

      9.      The Debtor also alleges that upon termination of the Agreement, the Debtor was unable to retrieve its property and assets located on the Project premises, including a portable office trailer, a drafting table, two office chairs, two filing cabinets, a laser level, a Conex 10 x 10 box, traffic control signs and stands, a concrete floor saw, a 2" water pump, an infrared asphalt heater box, a concrete trailer, a backhoe bucket and stakes and miscellaneous supplies (collectively, "Personal Property").

      10.      On June 1, 2015, the court entered a Consent Order signed by Precision and the Trustee allowing for payment by Precision to three of the Debtor's subcontractors that performed work on the Project. The Consent Order specifically states that it shall not be used for any

---

[2] The Complaint also seeks a temporary restraining order and injunction against Precision. The court held hearings on November 4, 2014 and November 12, 2014 on that portion of the Complaint and on an Emergency Motion for Turnover that was filed October 31, 2014 in the Bankruptcy Case. The court denied the Debtor's request for a temporary restraining order and injunction in an Order entered November 17, 2014 in this Adversary Proceeding. That same day the court entered a separate Order in the Bankruptcy Case denying the Emergency Motion for Turnover. Because the court's Order filed in the Bankruptcy Case focuses on the expedited nature of the relief sought by the Debtor in the Emergency Motion for Turnover, rather than the turnover request itself, the court does not consider its prior Orders to have a preclusive effect on the turnover claim in the Complaint.

substantive purposes in this Adversary Proceeding, but presumably the payment by Precision of the amounts owed to the subcontractors reduced the amount to which the Debtor claims it is entitled.

11. The Motion was timely filed in response to the Complaint. The hearing on the Motion was continued once at the request of the Debtor before the Bankruptcy Case was converted. On two occasions post-conversion, counsel for Precision and Fidelity consented to a continuance of the hearing on the Motion to allow the Trustee time to prepare a response to the Motion.

12. Upon conversion of the Bankruptcy Case, the court set June 15, 2015 as the deadline to file proofs of claim against the Debtor. To meet the claim deadline of June 15, 2015, even though the Motion was still pending and the claims between the Debtor and Precision remained unresolved, Precision timely filed a proof of claim ("POC") in the amount of $695,446.20 in the Bankruptcy Case. The Trustee has objected to the POC, and that matter is pending and not currently before the court.

13. Precision asserts that the causes of action in the Complaint are all non-core and should be referred to arbitration consistent with Section 26 of the Agreement. Because the Complaint does not contain any core causes of action, Precision argues the court does not have subject matter jurisdiction, and the Complaint should be dismissed.

14. The Trustee argues the claims contained in the Complaint are statutorily core under 28 U.S.C. § 157(b)(2)(A), (B), (C) and (E) because they concern the administration of the estate, the allowance or disallowance of claims against the estate, counterclaims by the estate against an entity that has filed a claim against the estate or would involve an order to turn over property of the estate.

B.   DISCUSSION.

1.   When a contract between two parties contains an arbitration provision, federal courts generally favor enforcement of a demand for arbitration pursuant to the terms of the contract. *Moses v. CashCall, Inc.*, 781 F.3d 63, 71 (4th Cir. 2015); *TP, Inc. v. Bank of America, N.A. (In re TP, Inc.)*, 479 B.R. 373, 382 (Bankr. E.D.N.C. 2012).

2.   In the context of a bankruptcy proceeding, courts look to the "core" or "non-core" nature of the underlying claim in determining whether to enforce an arbitration provision. *TP, Inc.* at 382 (citing *D&B Swine Farms, Inc. v. Murphy-Brown, LLC*, 430 B.R. 737, 741 (Bankr. E.D.N.C. 2010). Courts reason that a "principal purpose of the Bankruptcy Code is . . . to centralize disputes over the debtor's assets and obligations in one forum, thus protecting both debtors and creditors from piecemeal litigation and conflicting judgments." *Moses*, 781 F.3d at 72 (citing *Phillips v. Congelton, L.L.C. (In re White Mountain Mining Co.)*, 403 F.3d 164, 169-70 (4th Cir. 2005).

3.   A matter is core to a bankruptcy proceeding if "the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Stern v. Marshall*, 131 S. Ct. 2594, 2618 (U.S. 2011).

4.   In order to determine the "core" or "non-core" nature of the Complaint, the court will address each claim individually; however, the court can dispose of two of the Trustee's grounds for retention of the Adversary Proceeding as a preliminary matter. As the Trustee points out, proceedings that involve the allowance or disallowance of claims against the estate or the disposition of the estate's counterclaims against an entity that has filed a claim against the estate are statutorily core pursuant to 28 U.S.C. § 157(b)(2)(B) and (C). The Trustee asserts that because Precision filed a proof of claim for alleged liabilities stemming from the Agreement, the claims

6

contained in the Complaint constitute counterclaims against Precision and involve the allowance or disallowance of the POC.

5. The Complaint was filed over seven months before Precision filed the POC. Although a complaint may be considered a "counterclaim" for purposes of § 157(b)(2)(C) (*see TP, Inc.*, 479 B.R. at 383), that classification only makes sense if a claim is filed prior to the complaint. In this case, the Complaint is not a response or counterclaim to the POC, and the fact that Precision filed the POC in the face of a looming claims bar date does not retroactively render the Complaint statutorily core under § 157(b)(2)(C).

6. Similarly, although both the POC and the causes of action in the Complaint stem from the Debtor's work on the Project, the Complaint does not involve the allowance or disallowance of claims against the estate. The Debtor and Precision assert competing claims against each other, such that if the Trustee were to prevail in pursuing the Debtor's causes of action, the POC would presumably fail; however, that failure does not mean that disposition of the Complaint would involve the allowance or disallowance of the POC.

7. The court will address the causes of action within the Complaint to determine whether they are core, either on the grounds that they concern the administration of the estate or seek an order to turn over property of the estate, or on some other basis.

8. Breach of Contract.

    a. The Debtor asserts Precision "breached its contract with [the Debtor] by not paying [the Debtor] monies owed pursuant to the [Agreement] and for other reasons that will be shown at the trial of this matter."

7

      b.      The Debtor claims damages in excess of $75,000.00 for Precision's breach of contract, which include lost profits and income "and other losses and damages, including attorney's fees."

      c.      Although the Debtor's breach of contract claim appears to seek more than payment of accounts receivable, the losses asserted by the Debtor clearly stem from Precision's alleged failure to pay the Debtor pursuant to the terms of the Agreement. The Debtor may have suffered losses including attorney's fees when it did not collect on its accounts receivable from Precision, but the Debtor's breach of contract claim is essentially a claim for pre-petition accounts receivable.

      d.      Claims for accounts receivable against a party that has not filed a claim, and other litigation based on pre-petition state law contractual rights are non-core. *Humboldt Express, Inc. v. Wise Co. (In re Apex Express Corp.)*, 190 F.3d 624, 631 (4th Cir. 1999). The Trustee cites *Burns v. Dennis (In re Southeastern Materials, Inc.)*, 467 B.R. 337, 356 (Bankr. M.D.N.C. 2012), in asserting that because Precision filed the POC in the Bankruptcy Case, Precision is not a "stranger" to the Bankruptcy Case, and *Apex Express* is inapplicable to the Debtor's breach of contract claim. As the court has already stated, Precision had not filed the POC when the Complaint was filed. Further, the *Southeastern* court specifically acknowledged that *Apex Express* remains applicable to accounts receivable claims grounded in contract law. *Southeastern*, 467 B.R. at 356 (citing *Apex Express*, 190 F.3d at 631-32). *Apex Express* remains applicable even though Precision filed the POC in order to meet the claims deadline while the Motion remained pending.

      e.      In *Apex Express*, the Fourth Circuit Court of Appeals court cited *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, in which the United States Supreme

8

Court held that "restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages. . . . The former may well be a "public right," but the latter obviously is not." *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 71 (U.S. 1982).

  f. The *Apex Express* court addressed the reasoning of courts that have found claims based on accounts receivable and state law contracts to be core, noting that

> [t]he main justification supplied by these courts is that because the accounts receivable are in some sense the property of the bankruptcy estate, and because the outcome of the claim will affect the bankruptcy estate (by altering its size), then the claims are "core." . . . But, under this logic any claim involving a potential money judgment would be considered core. . . . Thus, the rationale used by these courts would swallow the rule established by *Northern Pipeline*.

190 F.3d at 632.

  g. The Debtor's breach of contract claim, though it might augment the Debtor's estate if allowed, is not a core claim. That cause of action should be referred to arbitration consistent with the Agreement.

  9. <u>Payment Under the Theories of Unjust Enrichment and *Quantum Meruit*</u>. The Debtor's second cause of action, brought in the alternative to the breach of contract claim, is subject to arbitration for the same reasons as the breach of contract claim. Although the theories of unjust enrichment and *quantum meruit* are grounded in common law rather than state statutory law, the Debtor's cause of action nevertheless seeks relief and damages related to amounts owed for work performed. The logic of *Apex Express* as applied to claims for accounts receivable is

applicable to the Debtor's second cause of action as well, and the claim for unjust enrichment and *quantum meruit* should be referred to arbitration consistent with the Agreement.[3]

10. <u>Conversion</u>.

a. The Debtor's conversion claim seeks the return of the Personal Property that was allegedly left on the Project premises and wrongfully withheld from the Debtor after Precision terminated the Agreement.

b. The conversion claim is a state law tort claim that arose pre-petition. The claim is related to the bankruptcy in that success on the merits of the conversion claim would result in an order requiring Precision to turn over property of the estate, and in this way the claim appears to be statutorily core under 28 U.S.C. § 157(b)(2)(E); however, the fact that a conversion claim is similar to a claim founded in bankruptcy, *e.g.* an action for turnover brought pursuant to § 542, does not deem a conversion claim core. *Krasny v. Bagga (In re Jamuna Real Estate, LLC)*, 357 B.R. 324, 332 (Bankr. E.D. Pa. 2006) (finding that a conversion claim could not be considered core simply because it was similar to a fraudulent transfer claim).

c. Further, the conversion claim would not necessarily be resolved in the claims allowance process, regardless of whether Precision had filed the POC prior to the Debtor filing the Complaint. Even though the conversion claim is related to the dispute between the parties, this court's determination of the POC would not necessarily resolve the conversion claim, and the claim cannot be considered to be core under *Stern*. 131 S. Ct. at 2618.

---

[3] In the Motion, Precision asserts that because the parties executed a valid Agreement, any relief under the equitable remedies of unjust enrichment or *quantum meruit* would be inappropriate. Because the court is referring this claim to arbitration, the court will refrain from addressing the merits of Precision's argument.

      d.      The conversion claim should be referred to arbitration consistent with the Agreement because it exists independent of the bankruptcy and is a part of the overall dispute between Precision and the Debtor that arose out of the Debtor's work on the Project.

11.      <u>Unfair and Deceptive Trade Practices</u>.  The Debtor's claim alleging unfair and deceptive trade practices ("UDTP Claim") is brought pursuant to N.C. Gen. Stat. § 75-1.1.  The Debtor urges that to the extent the UDTP Claim relates to the Debtor's breach of contract claim, the UDTP Claim alleges substantially aggravating circumstances that go beyond the purview of a breach of contract claim.  Similarly, the Debtor asserts that the UDTP Claim incorporates the Debtor's conversion claim and that this element of the UDTP Claim removes it from the realm of a breach of contract claim.  While this assertion may be true, the UDTP Claim, including any allegations of conversion, remains a state law claim that arose pre-petition and independent of the Bankruptcy Case.  The UDTP Claim should be referred to arbitration consistent with the Agreement.

12.      <u>Turnover of Property</u>.

      a.      The Debtor's turnover claim seeks turnover of all accounts receivable and the Personal Property.  The Debtor's claim for turnover of accounts receivable is non-core for the same reasons the Debtor's breach of contract claim is non-core: claims for accounts receivable that arose pre-petition and that are grounded in state law should not be considered core. *Apex Express*, 190 F.3d at 631; *Smith-Douglass, Inc. v. Smith (In re Smith-Douglass, Inc.)*, 43 B.R. 616, 618 (Bankr. E.D.N.C. 1984).

      b.      Although the turnover claim is brought pursuant to 11 U.S.C. § 542, adjudication and liquidation of the claim as it relates to the Debtor's accounts receivable would require a determination of the Debtor's rights under the Agreement through

application of state contract law. This factor distinguishes the turnover claim from a § 542 claim for mature, liquidated debt that is property of the estate, an action which may be deemed core under certain circumstances. *See Southeastern*, 467 B.R. at 355 (distinguishing trustee's attempts "to collect a matured, liquidated debt that is property of the estate" from "an unliquidated claim that requires a determination of the rights of parties under state contract law").

   c. In contrast to the Debtor's claim for turnover of accounts receivable, the claim for turnover of the Personal Property appears to be statutorily core, as it is appropriately grounded in § 542 and seeks an order to turn over property of the estate consistent with 28 U.S.C. § 157(b)(2)(E). Nevertheless, in the interest of efficiently adjudicating all claims between the parties, the Debtor's claim for turnover of the Personal Property should also be referred to arbitration. Extracting this claim from the remainder of the Complaint would prevent the arbitrator from squaring all claims between the parties and determining a liquidated amount owed either by Precision or the Debtor.

  13. <u>Payment by Fidelity Under the Payment Bond</u>. The Debtor states in the Complaint that under the terms of the Payment Bond, Fidelity is obligated to pay Precision's subcontractors, including the Debtor, for work performed on the Project. This portion of the Complaint should be stayed until arbitration of the breach of contract claim, unjust enrichment and *quantum meruit* claim, conversion claim, UDTP Claim and turnover claim can be conducted pursuant to the terms of the Agreement. If the arbitrator determines that Precision owes the Debtor under the Agreement, Fidelity will be liable for any amount Precision is unwilling or unable to pay to the Debtor, and the court should retain jurisdiction over this cause of action.

14. This Adversary Proceeding should be stayed until arbitration can be completed. The court recognizes that the Trustee's resources are limited, and that traveling to Atlanta, Georgia to represent the Debtor's estate in the arbitration may be financially prohibitive. Although arbitration may be less cost-effective than having the Complaint heard in this court, the court is bound by the practice of allowing non-core matters to be arbitrated when the parties have previously agreed to that dispute resolution process. Upon the conclusion of arbitration, the court will resume this Adversary Proceeding, including the Debtor's claim for payment by Fidelity under the Payment Bond; now therefore,

It is ORDERED, ADJUDGED and DECREED as follows:

1. The Motion to Dismiss the Complaint is denied;

2. The Motion to Stay is granted to allow Precision, and the Debtor to arbitrate the breach of contract claim, unjust enrichment and *quantum meruit* claim, conversion claim, UDTP Claim and turnover claim consistent with the terms of the Agreement;

3. The parties shall promptly schedule the arbitration. If the arbitration is not promptly scheduled, either party may request a hearing before this court to determine the appropriate action to ensure the Debtor's claims are expeditiously heard;

4. The parties shall notify the court within 14 days of any ruling by the arbitrator relating to the claims between the parties; and

5. This court shall retain jurisdiction over this Adversary Proceeding, and upon notification by the parties of the outcome of arbitration, the court shall schedule a status conference on the Complaint.

END OF DOCUMENT